Case No. 20-50237

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

**JOHN FAIRCHILD; SUSIE FAIRCHILD,**

**Plaintiffs - Appellants**

v.

**CORYELL COUNTY, TEXAS; STEVEN RUSSELL LOVELADY; WESLEY HARLAND PELFREY,**

**Defendants - Appellees**

_____

## ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF TEXAS, WACO DIVISION
### Case No. 6:19-CV-29

_____

## <u>APPELLANTS' BRIEF</u>

Bruce K. Thomas
Texas State Bar No. 19844300
Law Office of Bruce K. Thomas
12900 Preston Rd, Ste 590
Dallas, Texas 75230
Phone/Fax:  (214) 296-9650
bthomas@bthomaslaw.com

T. Dean Malone
Law Offices of Dean Malone, P.C.
Texas State Bar No. 24003265
dean@deanmalone.com
900 Jackson Street, Suite 730
Dallas, Texas 75202
Telephone:  (214) 670-9989
Telefax:      (214) 670-9904
Telefax:      (214) 670-9904
Attorneys for Appellants

Oral Argument Requested

1

**Case No. 20-50237**

**IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**

**JOHN FAIRCHILD; SUSIE FAIRCHILD,**

**Plaintiffs - Appellants**

**v.**

**CORYELL COUNTY, TEXAS; STEVEN RUSSELL LOVELADY;
WESLEY HARLAND PELFREY,**

**Defendants - Appellees**

_____

CERTIFICATE OF INTERESTED PERSONS

     The undersigned counsel of record certifies that the following listed persons

and entities as described in the fourth sentence of Fifth Circuit Rule 28.2.1 have an

interest in the outcome of this case. These representations are made in order that the

judges of this Court may evaluate possible disqualification or recusal.

**Plaintiffs-Appellants**

John Fairchild
Susie Fairchild

**Counsel for Plaintiffs-Appellants**

Bruce K. Thomas
Law Office of Bruce K. Thomas
12900 Preston Rd, Ste 590
Dallas, Texas 75230
[Tel./Fax] (214) 296-9650
*bthomas@bthomaslaw.com*

T. Dean Malone
Michael T. O'Connor
Kristen Leigh Homyk
Law Offices of Dean Malone, P.C.
900 Jackson Street, Suite 730
Dallas, Texas 75202
[Tel.] (214)670-9989
[Fax] (214) 670-9904
dean@deanmalone.com
michael.occonnor@deanmalone.com
kristen.homyk@deanmalone.com

**Defendants-Appellees**

Coryell County, Texas
Steven Russell Lovelady
Wesley Harland Pelfrey

**Counsel for Defendants-Appellees**

Eric Alexander Johnston
McGinnis Lochridge, L.L.P. Suite 2100
600 Congress Avenue
Austin, TX 78701
[Tel.] 512-495-6064
[Fax] 512-495-6093
ejohnston@mcginnislaw.com
*Counsel for Coryell County, Texas*

Jason Eric Magee
Allison, Bass & Magee, L.L.P.
402 W. 12th Street
AO Watson House
Austin, TX 78701
[Tel.] 512-482-0701
[Fax] 512-480-0902
e.magee@allison-bass.com
*Counsel for Steven Russell Lovelady*

Stephen Cass Weiland, Esq.
Squire Patton Boggs, L.L.P.
Suite 1700
2000 McKinney Avenue Dallas, TX 75201
[Tel.] 214-758-1504
[Fax] 214-758-1550
cass.weiland@squirepb.com
*Counsel for Wesley Harland Pelfrey*

Robert Allen Hawkins, Esq.
Squire Patton Boggs, L.L.P.
Suite 1700
2000 McKinney Avenue
Dallas, TX 75201
[Tel.] 214-758-1518
[Fax] 214-758-1550
robert.hawkins@squirepb.com
*Counsel for Wesley Harland Pelfrey*

s/ Bruce K. Thomas
Bruce K. Thomas
Counsel of Record for Appellants

## STATEMENT REGARDING ORAL ARGUMENT

Appellants present significant issues regarding whether the defense of qualified immunity may be resolved by summary judgment in cases such as this alleging multiple instances of excessive force against a mentally ill pretrial detainee. The excessive force culminated in two male detention officers holding the morbidly obese, 46 year-old female detainee in a prone position; placing pressure on her neck or upper back that restricted her breathing; and holding her in this manner until she died. These facts are as egregious as those that resulted in national outrage over the death of George Floyd, and deserve the full vetting of oral argument.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ........................................................2

STATEMENT REGARDING ORAL ARGUMENT ............................................5

TABLE OF CONTENTS..................................................................................6

TABLE OF AUTHORITIES ...........................................................................9

STATEMENT OF JURISDICTION................................................................13

STATEMENT OF THE ISSUES....................................................................13

STATEMENT OF THE CASE.......................................................................14

   A.  Prologue ....................................................................................... 14

     1.  *Page's mental illness was evident upon intake*......................... 14

     2.  *Jailer Lovelady engaged Page in an altercation on Saturday and injured her.* ................................................................................................ 15

   B.  Defendants Lovelady and Pelfrey entered Page's cell on Sunday morning, and initiated an altercation in which they slammed her to the floor, beat her, and restrained her in a prone position until she died. ................................ 16

SUMMARY OF THE ARGUMENT ...................................................................21

ARGUMENT ................................................................................................24

**ISSUE 1: The District Court erred in rendering summary judgment for Defendants Lovelady and Pelfrey on the basis of qualified immunity.** ............24

   A.  Legal Standards ........................................................................ 24

     1.  Qualified Immunity. ................................................................ 24

       (a)  *The judicially-created defense of qualified immunity should be abolished.* ............................................................................... 24

       (b)  *Qualified immunity standards on summary judgment.* ....................... 25

     2.  Excessive Force Claims by a Pretrial Detainee ....................................... 25

       (a)  *An objective standard applies to pretrial detainees.* ......................... 25

       (b)  *Quick resort to force creates a fact issue concerning objective reasonableness.* ......................................................................... 28

       (c)  *Passive resistance does not justify force.* ......................................... 29

(d)   *Conduct inconsistent with departmental policies or training is unreasonable.* .......................................................................... 30

(e)   *Even when force is justified, it must cease if the conditions justifying it cease.* ...................................................................................... 31

3.   Clearly established law provides that it constitutes excessive force to hold a detainee in a prone position and restrict the detainee's breathing. .................. 32

4.   Bystander Liability ................................................................. 34

5.   Video Evidence ...................................................................... 35

6.   Eggshell Plaintiff and Joint Conduct ...................................... 36

7.   Summary Judgment Standards ................................................ 37

8.   Standard of Review. .............................................................. 39

B.  Argument................................................................................ 39

1.   Lovelady and Pelfrey committed multiple unconstitutional acts of excessive force contrary to clearly established law, culminating in killing Page through mechanical asphyxia associated with physical restraint as a result of their combined conduct. Thus, qualified immunity in unavailable. ................ 39

(a)   *Lovelady's initial resort to force by deploying OC spray through the food-slot was excessive and unreasonable.* ................................................ 40

(b)   *Lovelady further used excessive force by entering Page's cell and repeatedly spraying Page with pepper spray.* ............................................ 42

(c)   *Lovelady used excessive force again by grabbing Page's arm and violently throwing her to the floor.* .............................................................. 44

(d)   *Lovelady and Pelfrey used excessive force holding Page to the ground and beating her.* ........................................................................................ 46

(e)   *Lovelady and Pelfrey used excessive force by holding Page in a prone position while they applied pressure to her back until she lost consciousness and died from physical asphyxiation.* .......................................................... 48

2.   Defendants Lovelady and Pelfrey also have liability as bystanders.......... 51

(a)   Lovelady has bystander liability for Pelfrey's unconstutional conduct... 51

(b)    Pelfrey has bystander liability for Lovelady's unconstitutional conduct. ................................................................................................. 52

3.   The District Court's analysis failed to correctly apply summary judgment principles and clearly established law. ........................................... 54

(a)    The Court improperly weighed evidence on summary judgment and incorrectly concluded that there are no material fact issues precluding summary judgment for Defendants Lovelady and Pelfrey........................... 54

(b)    The District Court failed to apply Fifth Circuit precedent regarding physical asphyxia resulting from holding detainees in a prone position, as well as a robust consensus of law in other circuits. ..................................... 57

**ISSUE 2: The District Court erred in implicitly overruling Plaintiffs' objections to the conclusory opinion of Defendants' expert William Jennings and the hearsay testimony from deceased Dr. Veasey.** ......................................62

A. Facts. ............................................................................................... 62

B. Standard of Review and Harmful error. ...................................... 63

**ISSUE 3: The District Court erred in rendering summary judgment for Defendant Coryell County, Texas.** ........................................................63

A. Legal Standards – A Local Government Employer's Independent *Monell* Liability. ............................................................................................... 64

C. Argument................................................................................. 67

**PRAYER** ......................................................................................68

**CERTIFICATE OF SERVICE** ..........................................................70

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS**..............................................................................71

# TABLE OF AUTHORITIES

**Cases**

*Abdullahi v. City of Madison*, 423 F.3d 763, 765, 769 (7th Cir. 2005)....................59

*Amador v. Vasquez*, 961 F.3d 721 (5th Cir. 2020) ............................................ passim

*Anderson v. City of Atlanta*, 778 F.2d 678, 686 (11th Cir. 1985) ...........................66

*Autin v. City of Baytown*, 174 F. App'x 183, 185 (5th Cir. 2005)...........................28

*Barrett v. Orange County Human Rights Com'n*, 194 F.3d 341, 350 (2d Cir. 1999) ....................................................................................................................................65

*Blackmore v. Kalamazoo County*, 390 F.3d 890, 900 (6th Cir. 2004) ....................66

*Blankenhorn v. City of Orange*, 485 F3d 463, 479-480 (9th Cir. 2007) .................28

*Brosseau v. Haugen*, 543 U.S. 194, 199 (2004) ............................................... 34, 35

*Champion McCue v. City of Bangor, Maine*, 838 F.3d 55, 64 (1st Cir. 2016) ........59

*Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 902 (6th Cir. 2004).. 32, 34, 41, 50

*Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 903 (6th Cir. 2004)...............59

*Chew v. Gates*, 27 F.3d 1432, 1439 (9th Cir. 1994) ..............................................64

*Cole v. Carson*, _ F.3d _, 2019 WL 3928715 , at * 19-21, & nn. 1, 10 (5th Cir. Aug. 21, 2019) (en banc) (Willet, J., Dissenting)..................................................24

*Darden v. City of Fort Worth, Texas*, 880 F.3d 722, 727 (5th Cir. 2018), *cert. denied*, __ U.S. __, 139 S. Ct. 69 (2018) ...................................................... passim

*Deorle v. Rutherford*, 272 F.3d 1272, 1282–83 (9th Cir. 2001)....................... 27, 34

*Deville v. Marcantel*, 567 F.3d 156, 168 (5th Cir. 2009) ...................... 28, 29, 38, 45

*Drummond v. City of Anaheim*, 343 F.3d 1052, 1059 (9th Cir. 2003) ............. 37, 59

*Estate of Armstrong v. Vill. of Pinehurst*, 810 F.3d 892, 901 (4th Cir. 2016)..........32

*Estate of Booker v. Gomez*, 745 F.3d 405, 424 (10th Cir. 2014)..............................59

*Estate of Jones v. City of Martinsburg, W. Va.*, 961 F.3d 661, 669 (4th Cir. 2020) .......................................................................................................... 47, 57, 60

*Fairley v. Luman*, 281 F.3d 913, 916–18 (9th Cir. 2002)........................................66

*Federal Dickson v. Am. Red Cross Nat. Headquarters*, No. CIV.A. 3:95-CV-2391P, 1997 WL 118415, at *5 (N.D. Tex. Mar. 10, 1997)..................................38

*Galvan v. City of San Antonio*, 435 Fed. Appx. 309, 311 (5th Cir. 2010) ..............46

*Garcia v. Salt Lake County*, 768 F.2d 303, 310 (10th Cir. 1985) ..........................65

*Goodson v. City of Corpus Christi*, 202 F.3d 730, 734, 740 (5th Cir. 2000) .... 30, 46

*Goodwin v. City of Painesville*, 781 F.3d 314, 323 (6th Cir. 2015) .................. 38, 41

*Grandstaff v. City of Borger*, 767 F2d 161 (5th Cir. 1985) .....................................36

*Griggs v. Brewer*, 841 F.3d 308, 315–16 (5th Cir. 2016).......................................48

*Gutierrez v. City of San Antonio*, 139 F.3d 441, 499 (5th Cir. 1998)... 25, 31, 33, 50

*Hale v. Townley*, 45 F.3d 914, 918 (5th Cir. 1995) .................................................35

*Hanks v. Rogers*, 853 F.3d 738,744 (5th Cir. 2017) ......................................... 29, 35

*Hill v. Carroll County, Miss.*, 587 F.3d 230 (5th Cir. 2009) ...................................58

*Hopkins v. Andaya*, 958 F.2d 881, 888 (9th Cir. 1992)...........................................66

*Kingsley v. Hendrickson*, 135 S.Ct. 2466, 2470 (2015). ................................. 26, 31

*Landis v. Baker*, 297 F. App'x 453, 465 (6th Cir. 2008).........................................27

*Lawler v. City of Taylor*, 268 F. App'x 384, 387 (6th Cir. 2008) ..........................27

*Lee v. Offshore Logistical and Transport, L.L.C.*, 859 F.3d 353, 354-55  (5th Cir. 2017) ....................................................................................................................39

*Lytle v. Bexar Cty.*, 560 F.3d 404, 413 (5th Cir. 2009) ...........................................31

*Martin v. City of Broadview Heights*, 712 F.3d 951, 959 (6th Cir. 2013)........ passim

*Martinez v. City of Pittsburg*, 809 Fed. Appx. 439, 440-441 (9th Cir. 2020) (mem.) .............................................................................................................................37

*Massey v. Wharton*, 477 F. App'x 256 (5th Cir. 2012) ..........................................41

*Melear v. Spears*, 862 F.2d 1177, 1186 (5th Cir. 1989) ..........................................36

*Memphis Community Sch. Dist. v. Stachura*, 477 U.S. 299, 306, 106 S.Ct. 25379 (1986).....................................................................................................................36

*Morgan v. Fairfield Cty., Ohio*, 903 F.3d 553, 565-67 (6th Cir. 2019) ..................64

*Newcomb v. City of Troy*, 719 F. Supp. 1408, 1416–17 (E.D. Mich. 1989) .... 64, 67

*Newman v. Guedry*, 703 F.3d 757, 763 (5th Cir. 2012)...........................................28

*Owen v. City of Independence*, 445 U.S. 622, 652, 100 S. Ct. 1398 (1980) ...........65

*Pena v. City of Rio Grande City, Texas*, No. 19-40217, 2020 WL 3053964, at *5 at n. 9 (5th Cir. June 8, 2020) .......................................................................... passim

*Poole v. City of Shreveport*, 691 F.3d 624, 629 (5th Cir. 2012).............................46

*Randall v. Prince George's Cty.*, 302 F.3d 188, 204 (4th Cir. 2002)......................35

*Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 155-51, 120 S.Ct. 2097 (2000) ...............................................................................................................38

*Rivas v. Freeman*, 940 F.2d 1491 (11th Cir. 1991) .................................................67

*Sanchez v. Young Cty.*, Texas, 956 F.3d 785, 795 (5th Cir. 2020) ..........................65

*Scott v. Harris*, 550 U.S. 372, 380-81 (2007)..........................................................35

*Simpson v. Hines*, 903 F.2d 400, 401 (5th Cir. 1990)..............................................32

*Tennessee v. Garner*, 471 US 1, 15-16 (1985) ........................................................30

*Thomas v. Cook County Sheriff's Dep't*, 588 F.3d 445, 455 (7th Cir. 2009) ..........66

*Trammell v. Fruge*, 868 F.3d 332, 342 (5th Cir. 2017) .................................... passim

*United States v. Loftis*, 607 F.3d 173, 180 n.2 (5th Cir. 2010) ...............................39

*Watts v. Laurent*, 774 F.2d 168, 179 (7th Cir. 1985)...............................................36

*Whitley v. Hanna*, 726 F.3d 631, 646 (5th Cir. 2013) .............................................35

*Wilson v. Seiter*, 501 U.S. 294, 304 (1991) .............................................................66

*Winzer v. Kaufman County*, 916 F.3d 464 (5th Cir. 2019) .............................. passim

*Ziglar v. Abassi*, 137 S. Ct. 1843, 1870-72 (2017) (Thomas, J., concurring) .........24

## Statutes

42 U.S.C. § 1983 ......................................................................................................64

Texas Health and Safety Code Chapter 573 ............................................................42

## Rules

Fed. R. Civ. P. 56(c)(1) & Advisory Comm. Note (2010) .......................................39

Fed. R. Evd. 801(a)-(c) ........................................................................62

Fed. R. Evd. 804(b)(1) ........................................................................62

Fed. R. Evd. 804(b)(1)(B) ...................................................................62

Fed. R. Evd. 805 ..................................................................................62

Fed. R. Evid. 704, Advisory Comm. Note (1972) ...............................50

## Other Authorities

Joanna C. Schwartz, *The Case Against Qualified Immunity,* 93 Notre Dame L. Rev. 1797 (2018) ........................................................................24

Katherine Mims Crocker, *Qualified Immunity and Constitutional Structure*, 117 Mich. L. Rev. 1405 (2019) (available at: https://repository.law.umich.edu/mlr/vol117/iss7/3) ...........................25

William Baude, *Is Qualified Immunity Unlawful?*, 106 Calif. L. Rev. 45, 82 (2018) ........................................................................................24

## STATEMENT OF JURISDICTION

Appeal from final decision of the District Court pursuant to 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

ISSUE 1: The District Court erred in rendering summary judgment for Defendants

Lovelady and Pelfrey on the basis of qualified immunity.

ISSUE 2: The District Court erred in implicitly overruling Plaintiffs' objections to

the conclusory opinion of Defendants' expert William Jennings and the

hearsay testimony from deceased Dr. Veaseay.

ISSUE 3: The District Court erred in rendering summary judgment for Defendant

Coryell County, Texas.

## STATEMENT OF THE CASE

A.    Prologue

Jailer Steven Lovelady was involved in a physical altercation with Kelli Leanne Page on Saturday, October 7, 2017, the day before he and Jailer Wesley Pelfrey engaged in a second altercation with her on Sunday, October 8, in which they killed her. (ROA.551 at 38:2-10; ROA.678-679 at 165:16—166:10; ROA.434-38 at Timestamp (TS)-8:29:41—8:34:10) At that time, Lovelady was 39 years old, 6'1'' tall, and weighed 230 pounds. (ROA.506; ROA.518 at 5:17-23) Pelfrey was 41 years old, 5'7" tall, and weighed 390 pounds. (ROA.511; ROA.697 at 5:22-23) Page was a 46 year-old female, 5'6" tall, morbidly obese at 220 pounds, and suffered from several physical ailments. (ROA.493, 488 [Autopsy])

1.    *Page's mental illness was evident upon intake.*

As discussed in the report of Plaintiffs' corrections expert, Scott A. DeFoe, upon intake Page disclosed that she suffered from depression, had been hospitalized for emotional/mental health issues in the last year, had previously attempted suicide, and had other mental and emotional issues. (ROA.762-764) She also was incoherent, having answered "No" to each of the following intake questions: "Do you know where you are?"; What season is it?"; and "How many months are there in a year?". (ROA.762-763) Lovelady participated in Page's intake. (ROA.631 at 118:9-14)

Additionally, Pelfrey interacted with Page on Sunday shortly before he and Lovelady entered Page's cell and began their assault, and thought her statements were nonsensical. (ROA.725-726 at 33:1—34:15) Pelfrey claimed that Page was upset, screaming, and making statements "out of the blue" that he did not understand. (ROA.726 at 34:4-15) Page allegedly stated that he [Pelfrey] was going in the [restraint] chair, she wasn't, and that she was going to stab Pelfrey in the eye with a hairbrush. (ROA.726 at 34:4-15) In response, Pelfrey threatened Page with a restraint chair. (ROA.727-728 at 35:19—36:3)[1]

According to Plaintiff's expert, the Jailer-Defendants, pursuant to their training, should have recognized from these facts that Page was mentally ill or experiencing a mental crisis, and the jailers should have used de-escalation techniques to address her issues rather than deploying OC spray (i.e., oleoresin capsicum or pepper spray) and physical force. (ROA.761-766)

2.    *Jailer Lovelady engaged Page in an altercation on Saturday and injured her.*

Defendant Lovelady claims that on Saturday, October 7, Page threw some sort of liquid on him, apparently a cleaning solution. (ROA.648 at 135:12-22; ROA.761) In response, Lovelady sprayed OC on Page through the food slot in the cell door. (ROA.548 at 35:9-21) He then entered the cell and engaged in a physical altercation

---

[1] The jail video has no audio that would corroborate the Defendants' claims of what was said. (ROA.434-38)

with Page in which he hit her head against the cell wall, bruising her forehead and face. (ROA.551 at 38:2-10; ROA.678-679 at 165:16—166:10) Lovelady then had Page confined to a restraint chair until she was ordered released by a lieutenant. (ROA.545—546 at 32:2—33:11; ROA.550 at 37:6-22) As a result of the Saturday altercation and the injuries Page suffered, Pelfrey was required to accompany Page to a hospital to treat her injuries. (ROA.717 at 25:6-12) It was also necessary to decontaminate Page and her cell, then move her to a different cell when she returned from the hospital. (ROA.551 at 38:11-17; ROA.611-612 at 97:12—99:11) The choice by Lovelady and Pelfrey to use force the next day may have resulted from their anger with Page as a result of the Saturday altercation. (ROA.765) At a minimum, Lovelady could anticipate that Page would react similarly to the manner she behaved on October 7 if he did the same thing the next day. (ROA.679-680 at 166:23—167:13)

**B.    Defendants Lovelady and Pelfrey entered Page's cell on Sunday morning, and initiated an altercation in which they slammed her to the floor, beat her, and restrained her in a prone position until she died.**

On Sunday, October 8, Lovelady and Pelfrey began their shift at 7:00 a.m. (ROA.722 at 30:16—31:2) Page awoke shortly before 7:30 a.m., and engaged in normal activities. (ROA.434-38 at TS-6:59:10—7:52:00) She got dressed and looked out the door window. (ROA.434-38 at TS-7:26:45—7:52:00) She picked up a hairbrush and brushed her hair. (ROA.434-38 at TS-7:52:24)

Shortly before 8:00, Page finished brushing her hair before the mirror at the rear of the cell; then picked up a cup of water from the sink, which she began to drink; then calmly walked to the cell door. (ROA.434-38 at TS-7:55:10-24) Upon reaching the door it appears she pressed a call-button on the wall. (ROA.434-38 at TS-7:55:24) She looked out the door window, as if she was waiting for a jailer to come, while she sipped water and stroked her hair with the brush. (ROA.434-38 at TS-7:55-24—7:57:47) Eventually she set the cup aside, returned to the door, continued to look out the window, and periodically tapped the door window with her hairbrush for a second or two at a time, as if she was trying to obtain a jailer's attention. (ROA.434-38 at TS-7:57:47—8:13:00)[2]

At approximately 8:13, someone comes to the window, apparently Jailer Pelfrey, who claims he talked with Page for 10 minutes. (ROA.434-38 at TS-8:13:14; ROA.725-726 at 33:16—34:15) Although Pelfrey claims Page was shouting and angry, no physical movements consistent with such conduct are visible. (ROA.434-38 at TS-8:13:14—8:23:35) Instead, Page can be seen slowly walking to the sink to get another cup of water, then returning to the door, sipping water, and

_____

[2] Even Defendant Pelfrey described Page's use of the hairbrush as "just tapping," rather than "banging" or "beating." (ROA.725-728 at 33:6—36:9) Pelfrey also testified he believed Page kicked the door, but this is not observed in the video. (ROA.434-38 at Timestamp 6:59:10—8:29:41) Page can be observed briefly bouncing her hip against the door. (ROA.434-38 at Timestamp 7:59:03-08).

apparently conversing with Pelfrey in a calm manner. (ROA.434-38 at TS-8:13:14—8:23:35)

After Pelfrey left, it appears Page again pressed the call button. (ROA.434-38 at TS-8:27:23-27) No one immediately responded, and Page can be seen slowing wandering around the cell with her hairbrush. (ROA.434-38 at TS-8:27:27—8:28:42) She eventually returned to the back of the cell, steadied herself against the sink with one hand, put on a pair of red slippers, and returned to the door, where she again tapped on the window with her hairbrush. (ROA.434-38 at TS-8:28:42-55) She had no idea she would be dead barely 5 minutes later. (ROA.434-38 at TS-8:34:10; ROA.482-490 [Autopsy])

Lovelady approached the cell door at TS-8:29:41. (ROA.434-38) He claims it was necessary to enter Page's cell and restrain her because she might have knocked the cell door out of alignment by hitting it with her hairbrush, and could then open the door. (ROA.568-569 at 55:20—56:11 ["Because she can hit it, keep hitting it, and the door could open up un-alignment. It was an alignment thing. And I don't want her to open it up and come out in the hallway."]) This was the only reason Lovelady gave for entering the cell; he did *not* claim that he entered the cell because of concern for Page's health or safety. (ROA.568-569 at 55:20—57:13) At no prior point to Lovelady's appearance does Page appear angry, out of control, or otherwise have the appearance of shouting or being disruptive. (ROA.434-38 at TS-6:59:10—

8:29:41) Jail video does not show any significant force employed by Page against the door, or any damage. (ROA.434-38 at TS-6:59:10—8:29:41) The record includes pictures of the jail's very substantial cell doors. (*E.g.*, ROA.407) Additionally, as even Defendants' expert concedes, Page's behavior was "non-aggressive," and she was segregated in a locked cell and therefore a danger to no one. (ROA.416-417) Yet, during the next five minutes after Lovelady approached Page's cell, Page was pepper-sprayed four times, thrown violently to the floor, punched in the face and kneed numerous times, then held in a prone position until she died of asphyxiation. (ROA.434-38 at TS-8:29:41—8:34:10; ROA.489)

The jailers concede that once Lovelady chose to use OC spray, it became necessary to remove Page from the cell to perform decontamination. (ROA.608-612 at 95:4-22, 96:8-12, 97:12—99:8) Thus, the jailers knew from the moment Lovelady deployed his OC spray, it would be necessary to extract Page from the cell. (ROA.765) Moreover, they knew from the altercation the previous day, and her conduct and verbal comments immediately prior to being sprayed with OC, that she would not voluntarily submit to being removed from the cell to again be confined to a restraint chair. (ROA.679-680 at 166:23—167:13; ROA.716-717 at 24:16—25:10) Nonetheless, the jailers did not develop a tactical plan to deal with Page in an appropriate and safe manner, and they did not follow the Jail's written policy to assemble a five-person extraction team, appropriately trained in extractions and

equipped with safety clothing and other devices, to safely remove a non-compliant detainee from a cell. (ROA.765; ROA.492-504 [Jail Policy-Cell Extraction]) Instead, the Defendant-Jailers rushed into the jail cell, with no prior communication or determination as to who would do what, and violently confronted Page with additional shots of pepper spray, and ultimately slammed her to the floor. (ROA.434-38 at TS-8:29:41—8:30:28) Once Page had been thrown to the floor, Lovelady beat her with knee strikes and closed-fist punches, and the jailers confined her in a prone position with pressure to her upper back or neck until she passed out and died (*See* ROA.434-38 at TS-8:29:41—8:34:10) The autopsy found the manner of death to be homicide caused by "mechanical asphyxia in association with physical restraint," with her obesity and other health conditions likely contributing to her death. (ROA.489)

Following a comprehensive review of relevant documents (*see* ROA.754-760), Plaintiffs' law enforcement and corrections expert, Scott A. DeFoe,[3] rendered several opinions. (ROA.761, 765-767, 770-771, 774-775, 777) He concluded that during their altercation with Page, Defendants Lovelady and Pelfrey used force that was excessive, unnecessary, and outside the norms of law enforcement and the corrections community, and ignored and failed to use well-known information or to comply with accepted police and jail practices in numerous respects, all of which

---

[3] DeFoe's qualifications are at pages 26-30 of his report. (ROA.778-782)

ultimately culminated in the death of Page by asphyxiation per the Autopsy Report. (ROA.761, 765-768, 771-772, 777) DeFoe further controverts the opinions of Defendants' proffered expert. (ROA.777-778)

## SUMMARY OF THE ARGUMENT

The final act of excessive force by the defendants in this case is in substance no different from the notorious death of George Floyd: officers held the victim in a prone position and applied pressure from above until the victim died from being unable to breathe – deliberately, needlessly, and unconstitutionally. But for Kelli Page, a frightened, mentally-ill detainee in a rural Texas jail, there was no media coverage, no national outrage, and no punishment of the offenders. There is only this lone civil suit brought by her mother and father. She at least deserves the justice that this civil suit provides, and the District Court sadly erred in straying from straightforward summary judgment principles in its haste to wrongly truncate these proceedings.

As with George Floyd there exists compelling video footage of the Defendants' wrongful conduct. Not only does the video fail to conclusively contradict Plaintiffs' account of the events, but it fully confirms the Defendants' needless, brutal assault on Kelli. It shows that Defendants first needlessly and precipitously assaulted Kelli with pepper spray in response to Kelli tapping the cell door seeking attention. In doing so the jailers unnecessarily contaminated Kelli and

her cell, thereby requiring her extraction. It further depicts Kelli retreating to the back of her cell and offering no active resistance. In violation of the County's cell extraction policy, the jailers nonetheless entered Kelli's cell without an extraction team and continued to assault her with pepper spray. Then Defendant Lovelady grabbed Kelli by the arm and violently threw her to the ground. After beating her, the jailers momentarily halted their assault. Kelli can then be seen starting to sit up, again offering no resistance or aggression, and obviously dazed and confused from both her impaired mental state and the jailers' senseless assault. But the jailers then renewed their attack by punching her in the face. They then flipped her to a prone position and restrained her face down with pressure to her neck or upper back until they literally snuffed the life out of her. That the Defendants did this is captured on camera and cannot reasonably be disputed; but to the extent that it is, it clearly raises fact issues to be resolved by a jury.

The only true question is whether it was reasonable for the jailers to use violence against Kelli that escalated to the point of killing her. To ask the question is to answer it. The jailers used force that was out of all proportion to any need and which every corrections officer in this circumstance should know was wholly unreasonable. Kelli never posed any threat to the jailers (or herself), and the jailers had multiple opportunities to safely exit the cell, whereupon they could have requested that an extraction team be formed for her safe removal. In numerous

respects the jailers failed to comply with reasonable corrections practices, including failing to follow the Jail's procedure for safely extracting a non-compliant detainee from a cell. The officers' ongoing use of extreme and deadly force was contrary to clearly established law. Fact issues therefore preclude summary judgment on the individual Defendants' qualified immunity defense.

The District Court reached a contrary conclusion only by improperly weighing the evidence and resolving credibly and fact issues adverse to Plaintiffs, and by engaging in speculation unsupported by the record.

The District Court also erred in relying upon the testimony from another proceeding of a dead doctor which is contradicted by the autopsy report of Page's death. Even if the testimony were admissible, it merely creates a fact issue.

Finally, even if the jail officers had a valid basis to claim qualified immunity, the district court erred in concluding that this alone would resolve the County's liability. A determination that an individual is protected by qualified immunity is not a determination that the governmental entity for whom the individual worked did not commit a constitutional violation. The County failed to meet its summary judgment burden, and the District Court's summary judgment order to the contrary is in error.

ARGUMENT

**ISSUE 1: The District Court erred in rendering summary judgment for Defendants Lovelady and Pelfrey on the basis of qualified immunity.**

A.    Legal Standards

    1.    Qualified Immunity.

        (a)    *The judicially-created defense of qualified immunity should be abolished*.

For purposes of preserving the issue for further review in the event this appeal proceeds beyond a panel opinion, Plaintiffs state, as they did below, that they do not concede that the doctrine of qualified immunity is a legally permissible defense in this case. (ROA.461) Rather, the defense of qualified immunity should be unavailable except as applied to state actors protected by immunity when 42 U.S.C. § 1983 was enacted. Defendants cannot show they occupy such positions. *See Ziglar v. Abassi*, 137 S. Ct. 1843, 1870-72 (2017) (Thomas, J., concurring); Joanna C. Schwartz, *The Case Against Qualified Immunity,* 93 Notre Dame L. Rev. 1797, 1798–99 (2018); William Baude, *Is Qualified Immunity Unlawful?*, 106 Calif. L. Rev. 45, 82 (2018); *see also Cole v. Carson*, _ F.3d _, 2019 WL 3928715 , at * 19-21, & nn. 1, 10 (5th Cir. Aug. 21, 2019) (en banc) (Willett, J., Dissenting).

Additionally, the judicially-created defense of qualified immunity violates the Separation of Powers doctrine of the Constitution. *See generally* Katherine Mims

Crocker, *Qualified Immunity and Constitutional Structure*, 117 Mich. L. Rev. 1405

(2019) (available at https://repository.law.umich.edu/mlr/vol117/iss7/3).

    (b)    *Qualified immunity standards on summary judgment*.

Qualified immunity is judged according to the well-known two-step standard:

(1) whether the alleged facts make out a violation of a constitutional right, and (2)

whether the right at issue was clearly established at the time of defendant's alleged

misconduct. *See, e.g., Darden v. City of Fort Worth, Texas*, 880 F.3d 722, 727 (5th

Cir. 2018), *cert. denied,* __ U.S. __, 139 S. Ct. 69 (2018). On summary judgment

the court must view the facts in the light most favorable to the nonmoving party and

draw all justifiable inferences in the non-movant's favor. *Id*.

Importantly, violations of department policies are relevant to a qualified

immunity defense because the existence of policies and corresponding notice to

officers becomes relevant in analyzing the reasonableness of an official's conduct.

*See Darden*, 880 F.3d at 732 n. 8. It is "difficult to conclude that the officers acted

reasonably if they performed an action that had been banned by their department or

of whose dangers in these circumstances they had been warned." *Gutierrez v. City

of San Antonio*, 139 F.3d 441, 449 (5th Cir. 1998).

    2.    Excessive Force Claims by a Pretrial Detainee

    (a)    *An objective standard applies to pretrial detainees.*

Excessive force claims asserted by a pretrial detainee are judged pursuant to an objective standard; i.e., whether the force used was objectively unreasonable. *Kingsley v. Hendrickson*, 135 S.Ct. 2466, 2470 (2015).

Detainee claims arise pursuant to the Due Process Clause of the Fourteenth Amendment rather than the Eighth Amendment's prohibition against cruel and unusual punishment. *Kingsley*, 135 S.Ct. at 2475. The Eighth Amendment does not apply because pretrial detainees have not been convicted of any offense and therefore cannot lawfully be punished. *Id*. Thus, a pretrial detainee can prevail merely by providing "objective evidence that the challenged governmental action is not rationally related to a legitimate governmental objective or that it is excessive in relation to that purpose." *Id*. at 2473-74. The Fourth Amendment also supports an excessive force claim and is analyzed by the same objective reasonableness standard. *See Graham v. Connor*, 490 U.S. 386, 388 (1989); *Amador v. Vasquez*, 961 F.3d 721, 727-28 (5th Cir. 2020).

Objective reasonableness turns on the facts of each particular case. *Kingsley*, 135 S.Ct. at 2473. In determining whether the force used was objectively unreasonable, a court may consider such factors as: "the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the

severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was *actively* resisting." *Id*. (emphasis added).

The foregoing factors, however, are not exclusive. *Id*. Appellate courts have additionally stated that courts must take into account whether the officers had reason to believe that the victim was either on drugs or mentally unstable and whether they knew that the victim was unarmed. *See Landis v. Baker*, 297 F. App'x 453, 465 (6th Cir. 2008) (citing *Deorle v. Rutherford*, 272 F.3d 1272, 1282–83 (9th Cir. 2001)).

Courts should also consider whether the victim's physical movements actually constituted active resistance, or whether the victim's behavior could have resulted from an inability to breathe or a struggle to survive an officer's illegal assault. *See Darden*, 880 F.3d at 733; *Martin v. City of Broadview Heights*, 712 F.3d 951, 959 (6th Cir. 2013) "Some resistance" alone does not make the officers' use of force reasonable. "The Fourth Amendment's protections do not evaporate the moment an individual resists an officer's command." *Martin*, 712 F.3d at 959-60 (citing *Lawler v. City of Taylor*, 268 F. App'x 384, 387 (6th Cir. 2008) (rejecting defendants' contention that force was reasonable merely because victim offered "*some resistance*" prior to being handcuffed; jury could find elbow jab and knee strikes amounted to excessive force against an arrestee who resisted being handcuffed while on the ground with an officer on top of him). Additionally, an individual has the right to reasonably resist an officer's use of excessive force. *See, e.g., Blankenhorn*

*v. City of Orange*, 485 F3d 463, 479-480 (9th Cir. 2007). In no event may officers use force that is not reasonably calculated to neutralize the resistance. *See Martin*, 712 F.3d at 960.

Consequently, in an excessive force case, the relevant question is whether, taking the plaintiff's version of the facts as true, the force used . . . was both excessive to the need and objectively unreasonable." *Pena v. City of Rio Grande City, Texas*, No. 19-40217, 2020 WL 3053964, at *3 (5th Cir. June 8, 2020) (quoting *Autin v. City of Baytown*, 174 F. App'x 183, 185 (5th Cir. 2005)). "It is irrelevant 'whether the force was justified based on the [defendant's] claimed interpretation of the situation at the time.' " *Id.*

> (b)     *Quick resort to force creates a fact issue concerning objective reasonableness.*

In determining whether force is excessive to the need, a jury may consider the speed with which an officer resorted to force. Quickly resorting to force may raise a fact issue as to whether the use of force was objectively reasonable. *Pena,* 2020 WL 3053964, at *6; *Winzer*, 916 F.3d at 475; *Trammell v. Fruge*, 868 F.3d 332, 342 (5th Cir. 2017) (citing *Newman v. Guedry*, 703 F.3d 757, 763 (5th Cir. 2012) (holding that disputes of fact were material because "a reasonable jury could find that the degree of force used was not justified where the officer 'engaged in very little, if any, negotiation' with the suspect and 'instead quickly resorted to' " force)); *Deville v. Marcantel*, 567 F.3d 156, 168 (5th Cir. 2009) (determining that "[a] reasonable

jury could infer from [the plaintiff's] deposition testimony that [the defendant officer] engaged in very little, if any, negotiation with [the plaintiff]—and find that he instead quickly resorted to breaking her driver's side window and dragging her out of the vehicle").

Thus, when only a few seconds elapse between officer's initial request that a suspect submit to being handcuffed, and the officer's attempt to force compliance physically, "a reasonable jury could infer that the officers used very little, if any, negotiation before resorting to physical violence, and that the officers' conduct did not constitute the required 'measured and ascending' actions calibrated to [the suspect's] conduct." *Trammell*, 868 F.3d at 342 (noting that only 3 seconds elapsed between officer's command and use of force).

### (c)     *Passive resistance does not justify force*.

Although officers may consider a suspect's refusal to comply with instructions in determining whether physical force is needed to effectuate compliance, officers must assess both the need for force and "the relationship between the need and the amount of force used." *Trammell*, 868 F.3d at 342 (quoting *Deville*, 567 F.3d at 167 (internal citations and quotes omitted)). "[W]here an individual's conduct amounts to mere 'passive resistance,' use of force is not justified." *Trammell*, 868 F.3d at 341 (citing *Hanks v. Rogers*, 853 F.3d 738, 746 (5th Cir. 2017) (determining the plaintiff's initial refusals to follow a police officer's

instructions amounted to, "at most, passive resistance" and did not justify the officers' use of a " 'half spear' takedown" against the plaintiff); and *Deville*, 567 F.3d at 168 (the plaintiff's refusal to get out of her car before her husband arrived on the scene constituted passive resistance)); *see also Pena,* 2020 WL 3053964, at *6 (same).

Moreover, a physical reaction accompanied by the failure to comply with a police order does not necessarily constitute active resistance. For example, even though a suspect failed to comply with a command to be handcuffed by pulling his arm away, a jury could determine that the officer was not justified in immediately resorting to force to compel compliance. *See Trammell*, 868 F.3d at 342; *see also Goodson v. City of Corpus Christi*, 202 F.3d 730, 734, 740 (5th Cir. 2000) (fact question precluded summary judgment on qualified immunity notwithstanding that suspect pulled arm away from officer).

> (d)    *Conduct inconsistent with departmental policies or training is unreasonable*.

It is also relevant to the reasonableness issue whether the officers' conduct was inconsistent with their governmental employer's policies or the officers' training. *See Tennessee v. Garner*, 471 US 1, 15-16 (1985); *Darden*, 880 F.3d at 732 n. 8. One of the reasons that the Supreme Court adopted an objective standard for excessive force claims brought by pretrial detainees is that many facilities "train officers to interact with all detainees as if the officers' conduct is subject to an

objective reasonableness standard." *Kingsley*, 135 S.Ct. at 2474. Fifth Circuit authority echoes this view. *See, e.g., Gutierrez*, 139 F.3d at 499 ("[I]t may be difficult to conclude that the officers acted reasonably if they performed an action that had been banned by their department or of whose dangers in these circumstances they had been warned"); *Darden*, 880 F.3d at 732 n. 8 ("While we certainly do not suggest that the violation of police department policies is sufficient to make out a constitutional violation, . . . their existence and corresponding notice to officers [is] relevant in analyzing the reasonableness of a particular use of force under the totality of the circumstances.").

> (e)     *Even when force is justified, it must cease if the conditions justifying it cease.*

It is also important to analyze whether conditions change during an officer's interaction with the detainee or during an officer's use of force. The analysis is therefore dynamic, not static. "An exercise of force that is reasonable at one moment can become unreasonable in the next if the justification for the use of force has ceased." *Lytle v. Bexar Cty.*, 560 F.3d 404, 413 (5th Cir. 2009). Thus, an excessive force inquiry is viewed from the danger that existed at the moment force is employed, and an officer must reassess the need for force as conditions change. *Amador*, 961 F.3d at 730 (five seconds sufficient time to evaluate changed conditions for using deadly force).

"[W]here a seizure's sole justification is preventing harm to the subject of the seizure, the government has little interest in using force to effect that seizure. Rather, using force likely to harm the subject is manifestly contrary to the government's interest in initiating that seizure." *Pena,* 2020 WL 3053964, at *5 at n. 9 (quoting *Estate of Armstrong v. Vill. of Pinehurst*, 810 F.3d 892, 901 (4th Cir. 2016)).

3.     Clearly established law provides that it constitutes excessive force to hold a detainee in a prone position and restrict the detainee's breathing.

Well prior to the events in the case at bar, clearly established law proscribed the use of "substantial or significant pressure" that creates asphyxiating conditions in order to restrain a subject who does not pose a material danger to the officers or others, regardless whether the suspect has yet to be handcuffed. *See Martin v. City of Broadview Heights*, 712 F.3d 951, 961-62 (6th Cir. 2013) (discussing *Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 902 (6th Cir. 2004), and *Simpson v. Hines*, 903 F.2d 400, 401 (5th Cir. 1990)).

As discussed in *Martin*, the Fifth Circuit in *Simpson v. Hines* dealt with a physical asphyxiation case. In *Simpson*, ten officers entered the jail cell of a "volatile, drug-affected" detainee who refused to surrender his personal effects or be searched. 903 F.2d at 401. An officer restrained Simpson's neck while others grabbed his arms and legs and brought him down to the ground. *Id*. at 402. An officer nicknamed "Beef" (due to his large size) sat on Simpson's chest as the others tried to handcuff him. Unable to do so, they rolled Simpson onto his stomach and double-

cuffed his hands and legs. *Id*. The medical examiner's report stated that Simpson died due to asphyxiation minutes after the struggle. *Id*. Finding the officers should have known the force they used was "grossly disproportionate to the need," the Fifth Circuit denied them qualified immunity. *Id*. at 403. The Sixth Circuit's reliance on *Simpson* in *Champion* "shows that creating asphyxiating conditions by applying 'substantial or significant pressure' to restrain a suspect who presents a minimal safety risk amounts to excessive force." *Martin*, 712 F.3d at 961-62.

This Circuit recently applied this settled law in *Darden*, 880 F.3d at 732-33, and held that a jury could find that an officer used excessive force where the officer allegedly choked, kicked, and punched victim and then forced victim into a prone position to handcuff him behind his back, causing the victim to suffer a heart attack. Among other authorities, *Darden* cited *Gutierrez* for the proposition that in analyzing the reasonable of the force used, it is appropriate to consider the officers' violations of departmental policy. *Darden*, 880 F.3d at 732 n. 8 (citing *Gutierrez*, 139 F.3d at 448-49). In *Gutierrez*, the court held genuine issues of fact existed as to whether officers acted reasonably in "hog-tying" an arrestee who later died. 139 F.3d at 448-49.

Also, prior to the events in the case at bar in 2017, several appellate cases have held that clearly established law requires officers to take into account "the diminished capacity of an unarmed detainee . . . when assessing the amount of force

exerted." *Martin*, 712 F.3d at 962 (quoting *Champion*, 380 F.3d at 904); *Deorle v. Rutherford*, 272 F.3d 1272, 1283 (9th Cir. 2001) ("[W]here it is or should be apparent to the officers that the individual involved is emotionally disturbed, that is a factor that must be considered in determining . . . the reasonableness of the force employed.").

It also was clearly established prior to the events in dispute "that violently slamming or striking a suspect who is not actively resisting arrest constitutes excessive use of force." *Darden*, 880 F.3d at 733. Similarly, it was clearly established at the time of these events that it is objectively unreasonable for officers to tackle an individual who is not fleeing, violent, or aggressive, and offers only minimal physical resistance, such as pulling his arm away from an officer. *Trammell*, 868 F.3d at 343.

Finally, in an obvious case the *Graham* excessive-force factors can establish the existence of unreasonable force, even without a body of relevant case law. *Darden*, 880 F.3d at 773 (citing, *inter alia*, *Brosseau v. Haugen*, 543 U.S. 194, 199 (2004)); *see also Graham v. Connor*, 490 U.S. 386, 396 (1989).

4.    Bystander Liability

"[A]n officer may be liable under § 1983 under a theory of bystander liability where the officer '(1) knows that a fellow officer is violating an individual's constitutional rights; (2) has a reasonable opportunity to prevent the harm; and (3)

chooses not to act.' " *Whitley v. Hanna*, 726 F.3d 631, 646 (5th Cir. 2013) (quoting *Randall v. Prince George's Cty*., 302 F.3d 188, 204 (4th Cir. 2002)). Since before 1995, the law was clearly established in the Fifth Circuit that an officer could be liable as a bystander in a case involving excessive force if he knew a constitutional violation was taking place and had a reasonable opportunity to prevent the harm. *Hamilton v. Kindred*, 845 F.3d 659, 663 (5th Cir. 2017); *Hale v. Townley*, 45 F.3d 914, 918 (5th Cir. 1995)).

     5.    Video Evidence

When videos capture the events in question, no genuine dispute of fact exists for anything that is clearly discernable in a videotape, even if sworn testimony in the record contradicts what the video shows. *Scott v. Harris*, 550 U.S. 372, 380-81 (2007); *see also Hanks v. Rogers*, 853 F.3d 738,744 (5th Cir. 2017). However, when the videos fail to capture "everything," a court may consider supplemental evidence, including deposition testimony, so long as it is viewed in the light most favorable to the non-moving party. *Brosseau v. Haugen*, 543 U.S. 194, 195 (2004). Only if the Plaintiff's version of events is utterly discredited by video evidence, such that the jury could not reasonably interpret acts depicted in the video in the manner suggested by the Plaintiff, should the video control over the Plaintiff's version of events. *Darden*, 880 F.3d at 729-30. Inconclusive video of an alleged excessive force event creates a fact issue for a jury. *See id*. at 730.

6.     Eggshell Plaintiff and Joint Conduct

The eggshell skull rule that a tortfeasor takes his victim as he finds him applies to § 1983 excessive force cases, *Darden*, 880 F.3d at 728, as do common law principles for joint tortfeasors. *Memphis Community Sch. Dist. v. Stachura*, 477 U.S. 299, 306 (1986); *see also Watts v. Laurent*, 774 F.2d 168, 179 (7th Cir. 1985); *Grandstaff v. City of Borger*, 767 F2d 161 (5th Cir. 1985). Consequently, even if preexisting health conditions increased the risk of death or harm to the victim during a physical altercation, and in that manner contributes to the victim's death, this does not preclude an excessive force claim. *See Darden*, 880 F.3d at 728. If there exists no reason to believe that the victim would have died absent the use of force, the factfinder may find that use of force was the direct and only cause of the victim's death. *See id*.

When defendants act in concert, the court should not consider each officer's conduct in a vacuum but should instead consider the effect of their combined actions. *Melear v. Spears*, 862 F.2d 1177, 1186 (5th Cir. 1989) (jury could properly have found that search was unconstitutional and both officers liable for their integral participation in the violation); *Amador*, 961 F.3d at 727 ("Because it is alleged that the officers acted in unison, we need not separately address the qualified immunity analysis for each officer."); *Grandstaff*, 767 F.2d at 168 (jury properly instructed that liability arises if defendant "commands, directs, advises, encourages, procures,

instigates, promotes, controls, aids, or abets a wrongful act by another"; verdict against four officers affirmed on joint liability theory); *see also Martinez v. City of Pittsburg*, 809 Fed. Appx. 439, 440-441 (9th Cir. 2020) (mem.) (in excessive force case, holding that integral participant rule applied and jury could determine that combined force used by officers was unreasonable) (citing, *inter alia*, *Drummond v. City of Anaheim*, 343 F.3d 1052, 1059 (9th Cir. 2003) ("squeezing the breath from a compliant, prone, and handcuffed individual despite his pleas for air involves a degree of force that is greater than reasonable")).

7.     Summary Judgment Standards

Summary judgment standards are of course well known and need not be belabored. *See, e.g., Darden*, 880 F.3d at 727. That said, in Section 1983 cases, district courts at times improperly accept the credibility of law enforcement defendants, and thereby run afoul basic summary judgment principles that courts should view the facts in the light most favorable to the nonmovant and not engage in the jury's function of weighing the evidence. *See, e.g., Pena*, 2020 WL 3053964, at *3 (district court failed to consider evidence in light most favorable to the plaintiff and improperly dismissed genuine dispute of material fact as merely "slightly differing"); *Winzer v. Kaufman County*, 916 F.3d 464, 474 (5th Cir. 2019), *reh'g and reh'g en banc denied*, 940 F.3d 900 (5th Cir. 2019), *cert. denied*, ⸺ U.S. ⸺,

2020 WL 3038295 (Jun. 8, 2020). ("the central error is the district court's . . . [adoption of] the officers' characterization of the events").

Federal courts apply the same rule as Texas practice that testimony from an interested witness cannot support summary judgment unless it is "clear, direct, and free from contradictions and inconsistencies." *Federal Dickson v. Am. Red Cross Nat. Headquarters*, No. CIV.A. 3:95-CV-2391P, 1997 WL 118415, at *5 (N.D. Tex. Mar. 10, 1997); *see also Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 155-51, 120 S.Ct. 2097 (2000) ("the court should give credence to the evidence favoring the nonmovant as well as that evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses."). Stated differently, "Summary judgment is not appropriate when questions about the credibility of key witnesses loom . . . and the evidence could permit the trier-of-fact to treat their testimony with skeptical scrutiny." *Pena*, 2020 WL 3053964 at *6 n. 11 , (quoting *Deville v. Marcantel*, 567 F.3d 156, 165 (5th Cir. 2009) (internal quotation and citation omitted), and citing *Goodwin v. City of Painesville*, 781 F.3d 314, 323 (6th Cir. 2015) ("Summary judgment is not appropriate where the opposing party offers specific facts that call into question the credibility of the movant's witnesses.")).

Pursuant to Rule 56, as amended in 2010, material relied on for summary judgment purposes need not be presented in admissible form, provided the substance

or content of the evidence can be reduced to admissible form at trial. *See, e.g., Lee v. Offshore Logistical and Transport*, L.L.C., 859 F.3d 353, 354-55 (5th Cir. 2017) (citing Fed. R. Civ. P. 56(c)(1) & Advisory Comm. Note (2010)).

8.      Standard of Review.

Summary judgments are reviewed de novo. *United States v. Loftis*, 607 F.3d 173, 180 n.2 (5th Cir. 2010).

B.      Argument

The Sunday altercation was captured on jail surveillance video, which Defendants submitted with their summary judgment motions. (ROA.296, 395, 420, 434-438) Although Plaintiff contends the video speaks for itself, the Defendants' "interpretation" of the video differs widely from Plaintiffs' observations. For example, even Defendant Pelfrey concedes that the video "makes it look like" he was placing pressure on the back Page's neck for over two minutes until she passed out. (*Cf.* ROA.732-734 at 40:10—42:1 *with* ROA.434-38 at TS-8:32:02—8:34:10) Plaintiffs respectfully submit that not only does the video raise fact issues as to the Defendant-Jailers' defense of qualified immunity, but conclusively disproves it and establishes multiple instances of excessive force by both jailers.

1.      Lovelady and Pelfrey committed multiple unconstitutional acts of excessive force contrary to clearly established law, culminating in killing Page through mechanical asphyxia associated with physical restraint as a result of their combined conduct. Thus, qualified immunity in unavailable.

Based on the summary judgment evidence, a jury could conclude that Defendants used excessive force multiple times during their encounter with Page, from the initial deployment of pepper spray through the food slot, to the restraint and pressure to Page's back until she lost consciousness and died from asphyxia.

(a)   *Lovelady's initial resort to force by deploying OC spray through the food-slot was excessive and unreasonable.*

Lovelady resorted to force within 2 seconds of Page's initial refusal of what apparently was a command that she put her hands next to the food slot to be handcuffed. In the video, Lovelady can be seen approaching the cell door at TS-8:29:41, and almost immediately opens the food slot. In response to Lovelady's command, Page can be seen shaking her head "no" at TS-8:29:48. Lovelady immediately grabs his OC, thrusts it into the food slot, and sprays Page in the face two seconds later, at TS-8:29:50. His immediate resort to force is objectively unreasonable. *See Pena,* 2020 WL 3053964, at *5 (force used within 19 seconds unreasonable); *Trammell*, 868 F.3d at 340-43. Page is not actively resisting at that point when she is first sprayed. At most, her apparent failure to instantly agree or comply with whatever Lovelady may have said reflects passive resistance. Passive resistance is insufficient basis to employ force. *Trammell*, 868 F.3d at 341; *Hanks*, 853 F.3d at 746. Further, it was unreasonable for Lovelady to immediately resort to force with pepper spray without any attempt to deescalate the situation, particularly since he knew Page suffered from mental illness, and she was secure in her cell and

danger to no one. *See Pena,* 2020 WL 3053964, at *6; *Massey v. Wharton*, 477 F. App'x 256, 262-63 (5th Cir. 2012); *Champion*, 380 F.3d at 904.

Lovelady claims he sprayed Page with OC because Page might have damaged the door by tapping on the window with a hairbrush, thereby knocking it open and being able to escape. Lovelady's explanation is too specious to require extensive discussion, but does reflect on his credibility. A jury could observe the very substantial cell door, and compare it to Page's conduct, and readily conclude that Lovelady's alleged concern is specious and that there existed no concern that Page would knock the door from its hinges. Lovelady's specious explanation, however, is reason to question his credibility, making his testimony insufficient to support summary judgment. *Pena*, 2020 WL 3053964 at *6 n. 11; *Goodwin*, 781 F.3d at 323.

A jury could conclude that a more reasonable explanation is that he was irritated by her use of the call button, and still angry from the incident from the day before, and he desired to punish and terrorize Page with the threat of using the restraint chair. Regardless of Lovelady's motivation, his conduct was objectively unreasonable in immediately resorting to force. *Pena,* 2020 WL 3053964, at *6; *Winzer*, 916 F.3d at 475; *Trammell*, 868 F.3d at 342; *see also* ROA.765 [DeFoe Report].

If there was any need to treat Page's tapping on the window for assistance as a disturbance, it was a situation that should have been addressed by mental health

professionals. (ROA.761-765 [DeFoe Report]) Lovelady was involved in the intake of Page (ROA.631 at 118:9-14), and a jury may therefore infer that he knew that Page had reported mental illness upon intake and had responded nonsensically to intake questions. Certainly Pelfrey knew from his encounter with Page a few minutes before that she was making no sense. (ROA.726 at 34:4-15) The jailers therefore should have recognized that Page was suffering from mental illness or a mental crisis that was causing her conduct in repeatedly seeking assistance. (ROA.762-764 [DeFoe Report, pp. 10-12]) The jailers could have called in the Jail's nurse, or could have referred Page to Mental Health Services. (ROA.636 at 123:1-10; *see also* Texas Health and Safety Code Chapter 573) Instead, they unreasonably threatened to punish her with a second day in the restraint chair and then pepper-sprayed her when she did not instantly comply. This was inconsistent with police and corrections norms, and served only to exacerbate the situation and do further damage to Page's mental health. (ROA.762-764 [DeFoe Report, pp. 10-12])

(b)  *Lovelady further used excessive force by entering Page's cell and repeatedly spraying Page with pepper spray.*

After Lovelady sprayed Page through the food-slot, she retreated to the back of her cell, still holding her hairbrush with one hand, and steadying herself against the sink with the other, apparently to keep from falling, just as she had done earlier when putting on her red slippers. (ROA.434-38 at TS-8:29:50—8:29:55) At that point (as well as other times during the encounter), Lovelady had the authority to

assemble an extraction team, in accordance with the Jail's written policy, to safely remove Page from her cell, but did not do so. (ROA.538 at 25:3-8; ROA.492-504)

In fact, because Lovelady had made the decision to use OC spray, he knew it would be necessary to remove Page from the cell so that both she and the cell could be decontaminated. Lovelady and Pelfrey also knew that Page was afraid, suffering from mental crisis, likely terrorized from her previous encounters with Lovelady, and therefore unlikely to cooperate in exiting the cell to be once again, at least from Page's viewpoint, be tortured with the restraint chair. Nonetheless, Lovelady and Pelfrey failed to prepare for this eventuality and did not assemble an extraction team, as jail policy requires. Instead, they entered the cell and sprayed Page with pepper spray again and again. This was unreasonable and contrary to law. *Massey*, 477 F. App'x at 262-63; ROA.765-770 [DeFoe Report])

When Lovelady entered the cell, Page had her back to him as she steadied herself against the sink. Lovelady approached her from behind, reached around to either side of her, and three times sprayed her in the face with OC. At no time while Lovelady stood behind Page and reaching around her to spray her in the face did Page make any sort of aggressive move. She merely flinched each time he sprayed her. It is true that she continued to hold her hairbrush, as she had since using it to brush her hair several minutes earlier, but she never brandished it or otherwise displayed it in a threatening manner.

Throughout the 18 seconds when Lovelady sprayed Page from behind three times, Page posed no threat to the defendants, and clearly was not a flight risk because she was confined to her cell. At any time the defendants could have safely left the cell and called for an extraction team. This would have allowed jail personnel to safely remove Page from the cell so that she and the cell could be decontaminated from Lovelady's OC spray.

A jury could determine that Page posed no physical threat to the jailers, and that the hairbrush was not a "weapon" or a threat to the officers. At most Page engaged in passive resistance, which did not justify the Defendants' ongoing use of force. Further, the Defendants speedy and continued escalation of force was objectively unreasonable and excessive. *Pena,* 2020 WL 3053964, at *6; *Amador*, 961 F.3d at 730; *Trammell*, 868 F.3d at 341.

> (c) *Lovelady used excessive force again by grabbing Page's arm and violently throwing her to the floor.*

After being sprayed with OC four times, Page bent down and pulled up a blanket from the floor with her right hand, which she attempted to drape around her shoulders in an apparent effort to protect her face from the OC spray, all the time with her back to Lovelady and Pelfrey. At TS-8:30:24, as Page was draping the blanket around her shoulders, Lovelady approached her from behind. He grabbed Page's right arm, first with his left hand, then securely with his right, and in one

motion pulled Page across his hip and slammed her to the floor. (ROA.434-38 at TS-8:30:20—8:30:27)

 and in a single motion grabbed her right arm, violently pulling her from the sink and swinging her around his body hard to the floor. Thus, within 45 seconds of *approaching* the cell door, Lovelady had assaulted Page 4 times with OC spray and had violently thrown her to the floor, all without Page committing even one aggressive act.

Throwing Page to the floor was clearly excessive to the circumstances and contrary to clearly established law. *Trammell*, 868 F.3d at 341-42; *Goodson*, 202 F.3d at 734, 740. Defendants claim that Lovelady was attempting to handcuff Page when Page resisted, lost her balance, and fell to the floor. But a jury could conclude from the video that this is not true. She did not lose her balance, but was instead thrown to the floor. To the extent Page could be characterized as resisting at all at this point, it was at most non-cooperation that amounts to nothing more than passive resistance. Passive resistance would not merit any use of force, and certainly not the violence Lovelady inflicted by throwing her to the floor. See *Trammell*, 868 F.3d at 341; *Hanks*, 853 F.3d at 746; *Deville*, 567 F.3d at 168.

Even if Page had been attempting to avoid being handcuffed by pulling her arm away, which is not observed in the video, this would not constitute active resistance that would justify slamming her to the ground. That would be no different than *Trammell* and *Goodson* where suspects pulled an arm away when an officer reached for it. In both cases this Court held that these individuals were not actively resisting and a jury could conclude that the officer's subsequent "tackle" of the suspect was clearly excessive to the circumstances. *Trammell*, 868 F.3d at 341-42; *Goodson*, 202 F.3d at 734, 740.

At any time prior to slamming Page to the floor, the defendants could have safely left the cell and called for an extraction team to remove Page from the cell so that she, and the cell, could be decontaminated from the OC Spray that Lovelady had repeatedly, and needlessly, deployed. The Defendants immediate resort to force does not constitute the required "measured and ascending" actions that must be calibrated to the individual's conduct. *Trammell*, 868 F.3d at 342 (noting that only 3 seconds elapsed between officer's command and use of force) (citing *Poole v. City of Shreveport*, 691 F.3d 624, 629 (5th Cir. 2012) (quoting *Galvan v. City of San Antonio*, 435 Fed. Appx. 309, 311 (5th Cir. 2010))).

    (d)   *Lovelady and Pelfrey used excessive force holding Page to the ground and beating her.*

The two jailers were individually and collectively physically superior to Page. She posed no threat to them, particularly after she had been thrown to the ground.

As noted, at any time the defendants could have safely left the cell and assembled an extraction team to safely remove her from the cell. Instead, once Page was on the ground, the Defendants held her on the floor and proceeded to beat her.

Lovelady initially climbed on top of Page while she was face down against the floor and repeatedly inflicted knee strikes and closed-fisted punches. (ROA.434-38 at TS-8:30:36). Pelfrey assisted by restraining Page's head and upper torso. (ROA.434-38 at TS-8:31:18-35) At one point Lovelady dropped his handcuffs when he grabbed Page's hairbrush, and Page grabbed the handcuffs and hid them underneath her. (ROA.434-38 at TS-8:30:30-36) There was no danger, however, she would use the handcuffs as a weapon because she was laying on top of them. *See Estate of Jones v. City of Martinsburg, W. Va.*, 961 F.3d 661, 669 (4th Cir. 2020) (jury could find that suspect armed with knife was nonetheless secured when he was pinned to the ground and physically unable to wield knife as a weapon). Regardless, Pelfrey turned Page over on her side and Lovelady quickly retrieved his handcuffs. (ROA.434-38 at TS-8:31:18-35) After Lovelady retrieved his handcuffs, Page began to slowly sit upright as if she believed the beating was over, but Lovelady then gratuitously punched her violently in the face with his fist, knocking her back on the floor, while Pelfrey continued to restrain her. (ROA.434-38 at TS-8:31:35-45)

Gratuitously punching Page in the face, after Lovelady retrieved his handcuffs, was unnecessary, excessive, and unreasonable. *Darden*, 880 F.3d at 732

(citing *Griggs v. Brewer*, 841 F.3d 308, 315–16 (5th Cir. 2016) (suggesting that "punching or otherwise gratuitously harming a restrained suspect constitutes excessive force"). Even if there had been reason to use force after Page grabbed the handcuffs that Lovelady carelessly dropped, the situation changed after he retrieved them. *See Amador*, 961 F.3d at 730. At the moment of the punch, the defendants were in no danger. They easily could have stood up, ceased their attack, and existed the cell and requested an extraction team per jail policy. The decision to continue beating Page was unreasonable and contrary to clearly existing law.

(e)   *Lovelady and Pelfrey used excessive force by holding Page in a prone position while they applied pressure to her back until she lost consciousness and died from physical asphyxiation.*

After Page sat up and Lovelady punched her in the face, *the jailers turned Page to a prone position, and restrained her face down for over 2 minutes, until she lost consciousness*. (ROA.434-38 at TS-8:32:02—8:34:10) A jury could conclude that the jailers were simply holding her until she passed out. Lovelady can be seen straddling Page's left leg and buttocks and apparently applying pressure on her back with his hands. It also appears that Pelfrey is holding Page's head down by placing his right forearm across her upper back or neck, and *using his left hand to gain leverage* against a block-type chair in the corner of the cell, so he could apply pressure with his right forearm. Even Pelfrey concedes that it appears in the video that he is putting pressure on Page's neck. (ROA.732-733 at 40:10—41:8

["[E]verybody's saying that I had my elbow in the back of her neck."])] Indeed, the several medical examiners who signed the Autopsy Report made exactly that observation. (ROA.489-490 ["She was subsequently restrained in a prone position, with one officer putting force on her upper back region . . . ."]) And that is because this is what the video shows.

Pelfrey claims he was never applying weight to Page's back, and that his arm was "tangled" underneath Page "pretty much the whole time." (ROA.737-738 at Pelfrey Depo. 45:21—46:18) But the video shows this to be untrue. (ROA.434-38 at TS-8:32:02—8:34:10) Before turning Page to the prone position a final time, both of Pelfrey's hands are clearly visible. (ROA.434-38 at TS-8:31:04-11) And during the two-minute death hold, Lovelady moves to the right from time to time, making visible Pelfrey's right arm position on top of Page. (ROA.434-38 at TS-8:32:02—8:34:10) Further, Pelfrey's white-gloved left hand can be seen set against the block-chair until he removes it after Page lost consciousness. (ROA.434-38 at TS-8:32:02—8:34:41) Likewise, he can be seen removing his right arm from Page's neck area - above her body - and placing his white-gloved hand on the floor. (ROA 434-38 at TS-8:34:10—8:34:23) Thus, his arm was not entangled underneath Page as he claimed.

The jailers' conduct in holding Page face down was contrary to the training of both men. Each admitted to knowing of the dangers of physical asphyxia, and

knew that an individual restrained in a prone position should be turned over quickly to allow the individual to breathe. (ROA.589-90 at 76:2-7:10, 77:3-20; ROA.702-703 at 10:15—11:3]) Acting contrary to their training was objectively unreasonable. *Gutierrez*, 139 F.3d at 499; *Darden*, 880 F.3d at 732 n. 8. It was also contrary to clearly established law to hold Page, a middle-aged morbidly obese woman, in a prone position for an extended time. *See supra* at I.A.C.

The summary judgment evidence raises a fact issue as to whether Pelfrey unreasonably held Page in an asphyxiating prone position in violation of clearly established law. *See Martin*, 712 F.3d at 961-62; *Champion*, 380 F.3d at 902; *Simpson*, 903 F.2d at 401; *Darden*, 880 F.3d at 732-33; see also ROA.771-775 [DeFoe Report])

Additionally, Plaintiffs' expert specifically refutes the conclusion of Defendants' expert who clams that the Jailer-Defendants' conduct was reasonable.[4] Lovelady's *modus operandi* is clear. If a detainee fails to comply instantly with his commands, no matter the reason, the detainee is punished with pepper spray, then restrained and beaten until compliance is achieved. This Cool-Hand-Luke approach to corrections, endorsed by Defendants' expert, is inconsistent with modern corrections norms that force be measured and proportionate to the need. In this

---

[4] As discussed in Issue 2, Plaintiffs objected to Jennings' conclusory opinion "that the judgments and actions taken by the officers were reasonable." (ROA.344, 418, 473)

instance the force employed was excessive to the need, clearly unreasonable, and in violation of clearly established law. (ROA.761, 765-768, 771-772, 777-778 [DeFoe Report, pp. 9, 13-16, 19- 20, 25-26]) Therefore Defendants are not entitled to qualified immunity. *Trammell*, 868 F.3d at 342.

2.      Defendants Lovelady and Pelfrey also have liability as bystanders.

(a)      Lovelady has bystander liability for Pelfrey's unconstutional conduct.

Additionally, the summary judgment evidence raises fact issues Lovelady's liability as a bystander. Lovelady readily accepted Jailer Pelfrey's assistance in restraining Page in a suffocating position. From a review of the video, it appears that Pelfrey places his forearm across Page's upper back or neck, assisting Lovelady in keeping Page in a prone position for over two minutes. (ROA.434-38 at TS-8:32:02—8:34:10) Further, it appears that Pelfrey uses his left arm to gain leverage so that he can assert pressure with his right. As noted, holding a detainee in such a position deprives the detainee of oxygen, and constitutes excessive force. *See supra* at I.A.C.

Lovelady was the shift officer on duty and held supervisory authority over Pelfrey. (ROA.538-539 at 25:22—26:1; ROA.633 at 120:18-21) Lovelady could have, and should have, instructed Pelfrey to cease confining Page in that manner and to turn her on her side so that she could breathe. Lovelady is looking straight down

at Pelfrey's arm while he straddled Page for over two minutes. A jury could conclude that his denial that he knew what Pelfrey was doing is not credible. By allowing Pelfrey to unconstitutionally restrain Page with excessive force, Lovelady is complicit in Pelfrey's violations of excessive force. *See, e.g., Whitley*, 726 F.3d at 646.

(b)    Pelfrey has bystander liability for Lovelady's unconstitutional conduct.

Additionally, the summary judgment evidence raises fact issues (if not conclusively establishes) Pelfrey's liability as a bystander. As discussed *supra*, Lovelady committed multiple, egregious violations of excessive force. Up to and including when Lovelady threw Page to the cell floor, Pelfrey literally stood by and did nothing. (ROA.434-38 at TS-8:28:41—8:30:24) After Page, was on the floor, Pelfrey readily assisted in restraining Page while Lovelady beat her, then restrained her in a prone position. (ROA.434-38 at TS-8:30:24—8:34:10)

Pelfrey could have easily intervened to stop Lovelady's repeated use of excessive force by refusing to provide assistance and informing Lovelady that he would not be part of Lovelady's abuse of a mentally ill detainee. Pelfrey's assistance was essential to Lovelady's use of force against Page. Putting aside the Jailers' failure to follow the Jail extraction policy for forcibly removing a noncompliant detainee, the Defendants themselves state that they were required to have at least two jailers present to be in the cell. Pelfrey and Lovelady were the only jailers on

duty working in the hall that Sunday. (ROA.538-539 at 25:22—26:20; ROA.570-571 at 57:20—58:8) Consequently, without Pelfrey's assistance, Lovelady could not remain in Page's cell. Once Pelfrey observed Lovelady's use of excessive force, had he informed Lovelady that he would not be a part of it, Lovelady would have been forced to end his assault on Page and leave the cell. Pelfrey had multiple chances to withdraw his assistance. Upon the first pepper spray for outside the cell, he could have declined to assist further. Likewise, upon each additional spray, he could have intervened by refusing to assist further. Even after Lovelady slammed Page to the floor and the struggle ensured, Pelfrey had opportunities to extricate himself. Certainly he had an opportunity to do so after Lovelady retrieved his handcuffs. Upon witnessing Lovelady's ongoing beating of Page while she was totally defenseless, he should have objected and refused to assist further. And of course, he should have never participated in the death hold.

Pelfrey clearly had the ability to turn Page on her side during the last two minutes of her life, and allow her to breathe, but failed to do so. This is evident because when Lovelady lost his handcuffs, Pelfrey had no trouble turning Page over so that Lovelady could retrieve them. He could have done the same thing during Page's final two minutes of life to allow Page to breathe. Instead he chose to assist Lovelady in holding Page in an asphyxiating prone position for over two minutes. (ROA.434-38 at TS-8:32:02—8:34:10) As noted, holding a detainee in such a

position deprives the detainee of oxygen, and constitutes excessive force. *See supra* at I.A.C. By assisting Lovelady in using excessive force that was contrary to clearly established law, and failing to intervene notwithstanding multiple opportunities to do so, Pelfrey is liable as a bystander. *See, e.g., Whitley*, 726 F.3d at 646.

3.     The District Court's analysis failed to correctly apply summary judgment principles and clearly established law.

> (a)     The Court improperly weighed evidence on summary judgment and incorrectly concluded that there are no material fact issues precluding summary judgment for Defendants Lovelady and Pelfrey.

The principal failings of the District Court's analysis is that it treats as true Defendants' version of events; fails to allow for alternative interpretations of the jail video; ignores completely Plaintiffs' expert testimony; fails to address most of the case authority Plaintiffs cite; and indulges all inferences in favor of Defendants. (ROA.1817-1831, 1832-1854) But perhaps most disturbing is omitting any reference to Page's mental illness. This omission colors that entirety of the Court's analysis as the Court depicts Page as a malcontent who caused her own problems rather than the frightened mentally ill detainee that she was.

 Thus, the court accepts Defendants' characterization of Page's conduct as "very disruptive." But this is disputed. The court avoids using the term "tapping," and instead refers to Page as "banging on her cell door." (ROA.1818) The court further accepts at face value Defendants uncorroborated claims that they tried to calm Page before entering the cell. Defendants' self-serving testimony is insufficient

to support summary judgment. The court fails to consider that a mentally ill detainee would not likely view threats of being confined to a restraint chair as calming. Additionally, the speed with which Lovelady resorted to pepper spray upon approaching the cell door contradicts Defendants' account.

The court also speculates that "at some point" Page's non-compliance would threaten her own safety and she might even suffer a medical crisis because of her physical maladies. (ROA.1820) A jury is entitled to conclude that "some point" had not been reached. Further, the Defendants stated reason for entering the cell was not out of any concern for Page's safety, but because of Lovelady's alleged concern that Page would knock the cell door off its hinges. The District Court does not address this specious concern.

The Court further states that Defendants did not apply pressure to Page's back. But this is merely what Defendants' claim, not what the video conclusively shows. In fact, the video appears to show just the opposite of what Defendants claim, as even Pelfrey admitted. The interpretation of the video and the Defendants' credibility present fact issues for a jury to resolve. *See Darden*, 880 F.3d at 729-30. Given that the video appears to show pressure applied to Page's back and neck, *as well as the fact that Page actually died from physical asphyxiation while the officers were on top of her*, a jury could easily conclude that Defendants used excessive force.

The District Court further accepted Defendants' claim that Page was actively resisting, and attribute aggression (i.e., biting and grabbing) that cannot observed either before Page is thrown to the floor, or after Lovelady retrieves his handcuffs. Page's few movements in the two minutes prior to losing consciousness consisted of her slowly raising and lowering her lower legs from the knee. (ROA.434-38 at TS-8:32:10—8:34:10) A jury could conclude that no reasonable officer would consider Page's movements to be a threat or aggressive, but would instead conclude that these the final movements of a dying woman unable to breathe.

Even after Page's foot drops the final time at TS-8:34:10, and she ceases all movement, the jailers continue their restraint for several seconds. They in fact do not turn her from the prone position for another 40 seconds. (ROA.434-38 at TS-8:34:10—8:34:50) This is contrary to their training to turn an individual from a prone position as soon as possible, and was valuable time lost as Page's brain was deprived of oxygen and resuscitation became impossible. Yet, the District Court incorrectly states that "Lovelady took immediate action to try to resuscitate her." (ROA.1821)

Altogether, Page remained in a prone position for nearly three minutes. (ROA.434-38 at TS-8:32:00—8:34:50) At TS-8:32:10, jail video shows that Lovelady had cuffed Page's left arm. It further appears that he succeeded in handcuffing both arms behind her back within 20 seconds, at TS-8:32:30, because

at that point Lovelady removed his right hand from Page's back. Additionally, it can be seen that Page is fully handcuffed after the jailers later stand up. (ROA.434-38 at TS-8:34:44) Thus, by at least 8:32:30, Page was fully secured. Yet, Defendants continued to hold her in a prone position for nearly two minutes without turning her over to breathe. Defendants continued restraint of Page in a prone position after she was secured is excessive and unreasonable. *Darden*, 880 F.3d at 732-33; *Estate of Jones*, 961 F.3d at 668.

Furthermore, during Defendants' assault on Page while she laid on the floor, they turned Page over so that Lovelady could retrieve his handcuffs. This demonstrates that Defendants could control Page and could have turned her from a prone position had they chosen to do so, even before she was handcuffed. Instead, it appears, and a jury could so conclude, that they intentionally held her in a prone position until she lost consciousness. Given the risk of death that the results from the manner of restraint Defendants employed, and the harm that resulted, Defendants effectively used deadly force to restrain Page. Clearly the use of deadly force was disproportionate to the circumstances.

    (b)    The District Court failed to apply Fifth Circuit precedent regarding physical asphyxia resulting from holding detainees in a prone position, as well as a robust consensus of law in other circuits.

The District Court also stated that Plaintiffs did not cite any clearly established law holding that the force used was excessive. With due respect, the District Court

simply failed to address controlling authority Plaintiffs cited, including *Darden*. Instead, the court stated that Plaintiffs rely on *Hill v. Carroll County, Miss.*, 587 F.3d 230 (5th Cir. 2009). (ROA.1828) But this is not a case that Plaintiffs even cited in their response. (ROA.453-454)

The District Court seemed to suggest that Defendants did not violate clearly established law because they did not use a choke hold. (ROA.1837) But this is a misreading of this Court's precedent. Although some excessive force cases addressed by this Circuit involved "hog-tying" and choke holds, it is not the particular technique utilized by law enforcement that is as important as the fact that a person is held in a manner where the individual cannot breathe. Thus, in *Darden*, which has similar facts to the present case, police held an obese individual in a prone position who was unable to breathe and died of a heart attack. 880 F.3d at 728. Police did not hog-tie the suspect.[5] This Circuit nonetheless held that the plaintiff in that case properly alleged excessive force. Thus, *Darden* recognized that excessive force resulting in physical asphyxiation, or hypoxia, does not require "hog-tying" or choke holds to violate clearly established law. It is excessive to hold a person in a prone position in any manner where the individual cannot breathe, however done, because

---

[5] Prior to holding the suspect in a prone position, the opinion notes that one officer "appeared" to have used a choke hold. 880 F.2d at 726. The choke hold, however, was not the cause of death, nor the principal focus of the plaintiff's claim or the opinion.

to do so unreasonably risks death. This is something the entire nation seems to have recognized in light of the George Floyd matter.

Notably, *Darden* further recognized that the excessive force at issue in that case, which included prone restraint that restricted breathing and caused a heart attack, violated clearly established law at the time of the incident in *Darden*, which was 2013. *See Darden*, 880 F.3d at 725, 733. This was well before the events in this case in 2017. The District Court, however, failed even to mention *Darden*, much less apply it. In doing so it erred.

Moreover, there is a robust consensus of persuasive authority from multiple circuits which holds, consistent with *Darden*, that clearly established law provides that prone restraints constitute excessive force. *See Champion McCue v. City of Bangor, Maine*, 838 F.3d 55, 64 (1st Cir. 2016); *Estate of Booker v. Gomez*, 745 F.3d 405, 424 (10th Cir. 2014); *Abdullahi v. City of Madison*, 423 F.3d 763, 765, 769 (7th Cir. 2005); *Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 903 (6th Cir. 2004); *Drummond v. City of Anaheim*, 343 F.3d 1052, 1061–62 (9th Cir. 2003). Appellants can find no contrary circuit authority allowing force approaching that used by Lovelady and Pelfrey where, like here, the suspect was merely non-cooperative and did not actively resist. Further, because the video in this case does not conclusively establish that Page was actively resisting, particularly in the last two minutes of her life, it is up to the jury to determine whether she was actively resisting the officers

*at that point* and whether the ongoing use of force was reasonable. *See Amador*, 961 F.3d at 730; *Darden*, 880 F.3d at 730, 732.

As stated in a recent Fourth Circuit decision involving a mentally ill black suspect, non-cooperation is not an excuse for deadly force. *Estate of Jones*, 961 F.3d at 670-71. Even if the police maintain the opposite, a jury can conclude by viewing video that a suspect was secured by being pinned to the ground, even if not handcuffed. *Id*. at 668. To continue to employ force against a secured unarmed suspect is "unnecessary, gratuitous, and disproportionate." *Id*. at 669. Excessive force incidents which kill the mentally ill and persons of color suspected of minor offenses is all too common. As the Fourth Circuit stated, "This has to stop." *Id*. at 723.

(c)    The District Court misconstrued the Jail's extraction policy.

The District Court erroneously accepted Defendants' "red herring" description of Plaintiffs' argument regarding the cell extraction policy. Contrary to what Defendants claimed, the policy does not limit itself to multiple extractions or riots. Although the policy contains a definition for the term "multiple extraction," that defined term is never used again throughout the policy. On its face the policy applies to *any* forcible cell extraction. (ROA.492-504) This is the same interpretation reached by Plaintiffs' expert. (ROA.767-771), and it is based on a plain meaning reading of the policy.

**ISSUE 2: The District Court erred in implicitly overruling Plaintiffs' objections to the conclusory opinion of Defendants' expert William Jennings and the hearsay testimony from deceased Dr. Veasey.**

    A.    Facts.

Plaintiffs also objected on several grounds to the purported testimony of Sparks P. Veasey, III, M.D. included in Defendant Pelfrey's Exhibit F. (ROA.345-356) The exhibit purports to include excerpts of a transcript from a coroner's inquest into Page's death. Dr. Veasey testified that he believed the autopsy was incorrect and Page's death was a result of preexisting conditions.

Plaintiffs objected that the transcript is hearsay, and that the transcript contains hearsay within hearsay. (ROA.836-37) *See* Fed. R. Evd. 801(a)-(c), Fed. R. Evd. 804(b)(1), Fed. R. Evd. 805.

Plaintiffs also objected that Dr. Veasey was not designated as an expert in this case, and therefore his opinions should not be considered. (ROA.837)

Finally, Plaintiffs objected that Dr. Veasey is deceased, and therefore cannot testify at trial or be available for deposition or cross-examination by Plaintiffs. (ROA.837) Defendants have not demonstrated that the testimony is offered against a party (or its predecessor) who had an opportunity and similar motive to develop the testimony by cross-examination. *See* Fed. R. Evd. 804(b)(1)(B). As a result,

Veasey's hearsay testimony cannot be proffered in admissible form in the present case.

Nonetheless, even if Dr. Veasey's opinions could properly be considered, they would at most create a fact issue for the jury as to whether Page would have died on October 8, 2017, but for the excessive force used of the Defendants. *See Darden*, 880 F.3d at 728 (applying eggshell skull rule). The autopsy concluded that Page died of mechanical asphyxia. Dr. Veasey's opinion to the contrary at most raises a fact issue.

B.      Standard of Review and Harmful error.

Evidentiary objections are review for abuse of discretion. *See Winzer*, 916 F.3d at 473. The district court specifically relied on Veasey's testimony, without mentioning Plaintiff's objections, thereby implicitly overruling them. (ROA.1838) The district court abused its discretion in relying on the hearsay testimony of deceased Veasey. The error is not harmless because it affected Appellants' substantial rights by potentially tipping the balance of the outcome at summary judgment, thereby severely inhibiting Appellants' ability to assert their claim. *Winzer*, 916 F.3d at 473.

**ISSUE 3: The District Court erred in rendering summary judgment for Defendant Coryell County, Texas.**

Coryell County's summary judgment motion was premised solely upon the assumption that if the defense of qualified immunity is applicable to the two

individual defendants, then there can be no liability against the County. (ROA.422-433) The County's premise is incorrect. As discussed *supra*, fact issues should preclude summary judgment for the individual Defendants, thereby making summary judgment for the County at least premature. *Winzer*, 916 F.3d at 477. But even if this was not the case, a determination that qualified immunity applies to its jailers would not resolve the issue of the County's liability.

A.    Legal Standards – A Local Government Employer's Independent *Monell* Liability.

A municipality or county is a "person" under 42 U.S.C. § 1983, and so can be held liable for constitutional injuries for which it is responsible. *Monell v. Dep't of Social Servs.*, 436 U.S. 658, 690 (1978). A determination that qualified immunity applies to individual actors does not *ipso facto* relieve the governmental entity for which they worked from liability. *See, e.g., Morgan v. Fairfield Cty., Ohio*, 903 F.3d 553, 565-67 (6th Cir. 2019) (holding that County was liable for policy causing officer's unconstitutional search of premises, and resulting injuries to plaintiffs, notwithstanding that qualified immunity applied to officers because law was not clearly established at the time of officers' unconstitutional search); *Chew v. Gates*, 27 F.3d 1432, 1439 (9th Cir. 1994) (noting that a determination that Los Angeles officer was protected by qualified immunity would not bar action against the city); *Newcomb v. City of Troy*, 719 F. Supp. 1408, 1416–17 (E.D. Mich. 1989) (successful qualified immunity defense by officer did not preclude determination that City was

responsible for unconstitutional conduct for which it, unlike the officer, enjoys no immunity).

Similarly, the combined conduct of several municipal employees acting pursuant to municipal policy may add up to a constitutional violation even if none of the named defendants individually violated the Constitution. *See, e.g., Barrett v. Orange County Human Rights Com'n*, 194 F.3d 341, 350 (2nd Cir. 1999) ("[U]nder *Monell* municipal liability for constitutional injuries may be found to exist even in the absence of individual liability, at least so long as the injuries complained of are not solely attributable to the actions of named individual defendants."); *Garcia v. Salt Lake County*, 768 F.2d 303, 310 (10th Cir. 1985) ("if the County had ten people working for it and following a pattern and practice of the County the jury could find all of them not guilty, and still the cumulative effect of what they did pursuant to the practice or policy of the County could be a violation of the Act by the County); *see also Owen v. City of Independence*, 445 U.S. 622, 652, 100 S. Ct. 1398 (1980) (a "'systemic' injury" may "result not so much from the conduct of any single individual, but from the interactive behavior of several government officials, each of whom may be acting in good faith." (citation omitted)); *Sanchez v. Young Cty.*, Texas, 956 F.3d 785, 795 (5th Cir. 2020)) ("confinement conditions may be constitutionally inadequate if, when viewed in combination, they have a 'mutually

enforcing effect that produces the deprivation of a single, identifiable human need.'" (quoting *Wilson v. Seiter*, 501 U.S. 294, 304 (1991)).

Likewise, a municipality's failure to provide adequate jail funding, staffing, or procedures may cause a constitutional violation even if the individual staff members involved are doing the best under untenable circumstances. *See Thomas v. Cook County Sheriff's Dep't*, 588 F.3d 445, 455 (7th Cir. 2009) (finding deliberate indifference by governmental defendant, notwithstanding lack of such findings against individual defendants, where known breakdown in procedures made it impossible for medical staff to respond adequately); *Blackmore v. Kalamazoo County*, 390 F.3d 890, 900 (6th Cir. 2004) (failure to provide substitute nurse when jail nurse was absent could support municipal liability); *Anderson v. City of Atlanta*, 778 F.2d 678, 686 (11th Cir. 1985) (*Monell* and its progeny do not require that a jury must first find an individual defendant liable before imposing liability on local government.).

For similar reasons, a municipality may be liable where the plaintiff's injury results from improper training or procedure even if the individual officer is exonerated. *See Fairley v. Luman*, 281 F.3d 913, 916–18 (9th Cir. 2002) (improper arrest and detention resulted from collective inaction); *Hopkins v. Andaya*, 958 F.2d 881, 888 (9th Cir. 1992) (city could be liable for improper training/procedure even if the officer was found not liable for excessive use of force); *Rivas v. Freeman*, 940

F.2d 1491 (11th Cir. 1991) (county held liable for lack of policies, procedures, and training, but arresting officers were merely negligent).

B.     Standard of Review.

As with Issue 1, the Court's standard of review is de novo. *Loftis*, 607 F.3d at 180 n.2.

C.     Argument.

Coryell County's motion for summary judgment was based on the unfounded notion that if qualified immunity applies to the individual defendant officers, the County cannot be subject to *Monell* liability under any circumstances. This is inaccurate. As set forth above, there are a number of circumstances when a governmental employer may be liable for its own unconstitutional conduct, even though none of its employees are liable. This specifically includes circumstances where employees have qualified immunity, but the local governmental unit for which they worked has no immunity. *See Morgan*, 903 F.3d at 565-67; *Chew*, 27 F.3d at 1439; *Newcomb*, 719 F. Supp. at 1416–17.

In the present case, the individual Defendants are not entitled to qualified immunity, but even if they were, that does not *ipso facto* resolve the issue of the County's liability. The County presented no other basis for summary judgment and made no attempt to show that it was no liable on any of several *Monell* theories for which the qualified immunity of its employees is irrelevant. Accordingly, its motion

should have been denied because the County failed to meet its summary judgment burden to conclusively establish that it was entitled to judgment. The District Court therefore erred.

## PRAYER

Appellants pray that the District Court's orders granting summary judgment for each Defendant be reversed and that the case be remanded for further proceedings, or for such alternative relief they are entitled.

Respectfully submitted,

/s/ Bruce K. Thomas
Bruce K. Thomas
State Bar No. 19844300
Law Office of Bruce K. Thomas
12900 Preston Rd., Suite 590
Dallas, Texas  75230
Phone/Fax:  214/296-9650
bthomas@bthomaslaw.com

T. Dean Malone
Texas State Bar No. 24003265
dean@deanmalone.com
Michael T. O'Connor
Texas State Bar No. 24032922
michael.oconnor@deanmalone.com
Kristen Leigh Homyk
Texas State Bar No. 24032433
kristen.homyk@deanmalone.com
Law Offices of Dean Malone, P.C.
900 Jackson Street
Suite 730
Dallas, Texas 75202
Telephone:   (214) 670-9989
Telefax:       (214) 670-9904

**ATTORNEYS FOR APPELLANTS**

# CERTIFICATE OF SERVICE

I certify that on July 27, 2020, the foregoing APPELLANTS' BRIEF was served, via the Court's CM/ECF Document Filing System, https://ecf.ca5.uscourts.gov/, upon the following registered CM/ECF users:

Eric Alexander Johnston
McGinnis Lochridge, L.L.P. Suite 2100
600 Congress Avenue
Austin, TX 78701
[Tel.] 512-495-6064
[Fax] 512-495-6093
ejohnston@mcginnislaw.com
*Counsel for Coryell County, Texas*

Jason Eric Magee
Allison, Bass & Magee, L.L.P.
402 W. 12th Street
AO Watson House
Austin, TX 78701
[Tel.] 512-482-0701
[Fax] 512-480-0902
e.magee@allison-bass.com
*Counsel for Steven Russell Lovelady*

Stephen Cass Weiland, Esq.
Squire Patton Boggs, L.L.P.
Suite 1700 2000
McKinney Avenue Dallas, TX 75201
[Tel.] 214-758-1504
[Fax] 214-758-1550
cass.weiland@squirepb.com
*Counsel for Wesley Harland Pelfrey*

Robert Allen Hawkins, Esq.
Squire Patton Boggs, L.L.P.
Suite 1700
2000 McKinney Avenue
Dallas, TX 75201
[Tel.] 214-758-1518

[Fax] 214-758-1550
robert.hawkins@squirepb.com
*Counsel for Wesley Harland Pelfrey*

/s/ Bruce K. Thomas
Bruce K. Thomas

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

1.     This brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B) because this brief contains 12,997 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.     This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) because this brief has been prepared in a proportionally spaced typeface using Word Version 2013 in Times New Roman type 14-point for text and 12 point for footnotes.

/s/ Bruce K. Thomas
Bruce K. Thomas